MONCURE, P.,
delivered the opinion of the court.
This is a writ of error to a judgment of the circuit court of Louisa county, rendered on the 1st day of October, 1879, convicting the plaintiff in error, Albert Mitchell, of murder inthe-first degree, and sentencing him therefor to be hanged by the neck until he be dead. He was convicted on an indictment found in the county court of said county, at its April term, 1879, against William Talley, Ann Eliza Jackson and the said Albert Mitchell, which indictment contains ten counts, in which the accused is charged with having, on the 9th day of March, 1879, murdered Charles K. Walton, in the manner and by the means set out in the said counts respectively. On the 15th day of April, 1879, the accused were arraigned on the said indictment in the said county court, and thereupon demanded to be tried in the circuit court of said county, pursuant to the act of assembly in such case made and provided; whereupon they were remanded for trial in the said circuit court. And the clerk of the said county court was ordered to certify and transmit to the clerk of the said circuit court a record of the proceedings in the * said county court in relation to the said prosecution, and copies of the indictment and all other papers connected with the case; which was accordingly done. Thereafter, to-wit, on the 24th day of September, 1879, the accused were set to the bar of the said circuit court, and demurred generally to the whole indictment and to each count thereof; and the prisoner’s counsel being called on to state the ground of the demurrer, said they were not prepared to state any in support thereof. The court overruled the same. And thereupon they plead not guilty to the indictment, and for their- trial put themselves upon the country, and elected to be tried separately. And thereupon Albert Mitchell was set to the bar for trial. Various proceedings were had in the case on the last-mentioned and future days of the said circuit court, which need not be here mentioned, at least for the present, until the 26th day of September, 1879, when the jury sworn to try the case, having fully heard the evidence and arguments of counsel and retired to their room and considered the case, returned into court and rendered the following verdict:
“We, the jury, find the prisoner. Albert Mitchell, guilty of murder in the first degree, this the 26th day of September, 1879.
"Thos. J. Plea'ants, Foreman.”
On the 1st day of October, 1879, it being demanded of the said Albert Mitchell if anything for himself he had or knew to say why the court to judgment and execution against him of and upon the premises should not then proceed, and nothing being alleged in delay of judgment, it was therefore considered by the court that he be hanged by the neck until he be dead, &c.
Upon the trial of the said cause, the prisoner tendered three bills of exceptions, which were received, signed and sealed by the court, and ordered to be made a part of the record in the said cause. As all, or nearly all, of the questions arising in the cause are presented by these bills of exceptions. they will be here fully or substantially stated and considered in the order in which they are numbered:
“1st bill of exceptions.
“Commonwealth v. Albert Mitchell, for murder.
“Be it remembered that when the venire summoned in this case was called, the prisoner by his counsel moved the court to quash the venire facias upon the ground that the list from which the venire had been summoned had been furnished by the judge of the county court of Louisa; whereupon the court quashed the said writ of venire facias, which is as follows:”
Here follows the said writ, after which is inserted the “list of jurors referred to above;” that is, in the said writ. In which list twenty-four names are included.
The said bill then proceeds as follows:
“Endorsement by sheriff.
“Executed by summoning all of the parties on the list appended hereto.
“R. F. Moss, S. L. C.”
*619 And the court then furnished the sheriff of Louisa a list containing the names of twenty-four persons, who were the same persons named in the venire facias issued . by the judge of the county court of Louisa, and which had been quashed, from which list, &c.. the officer was ^directed to summon the said twenty-four persons, whose names were mentioned in the list appended to the first writ of venire facias, to attend the court forthwith for the trial of the prisoner; which is as follows: Then follows the “3d writ,” which is the same in form and substance with the first writ referred to, except that in the first, writ the twenty-four person^ therein mentioned, are required “to be summoned from a list to be furnished by the judge of the county court of said county, to appear before the judge of the circuit court of said county, at the courthouse, on the 23d day of September, 1879;” whereas in the second writ, they are required “to be summoned from a list to be furnished by the judge of the circuit court of said county, at the courthouse, on the 24th day of September, 1879.” Then follows the “list of jurors referred to” in said “2d writ;” being the same with those named in the list referred to in the said first writ.
The said bill then proceeds as follows:
“Whereupon the prisoner by his counsel moved the court to quash this last writ of venire facias, upon the ground that the list from which the venire was directed to be summoned contained only the names of 24 persons. 2d. Upon the ground that the said list and the said writ contained the names of the same persons who had been summoned from a list furnished by the judge of the county court of Louisa, to attend the court on the 1st day of its term, and who had been in attendance on the court from its commencement, during which time a large number of the citizens of Louisa had been present, among whom were a large number of witnesses, some 40 or 50, summoned on behalf of the Commonwealth, to testify against the prisoner and those jointly indicted with him, for the murder of Charles K. Walton; and also the friends *and relatives of said Walton and others interested in the prosecution of the prisoner and those indicted with him, it being known to the court that these prosecutions had attracted much attention and excited great interest in the county of Louisa and the adjoining county of Gooch-land, where the dec’d had many relations; that apprehensions were felt, lest because of the necessary delay in the trials, thoughtless and inconsiderate persons might be tempted if any effort should be made by designing and wicked parties to arouse their natural indignation at such a crime against the prisoners to organize and subject the prisoners to the violence of a mob. This apprehension was only in regard to the other prisoners indicted jointly with the prisoner, Albert Mitchell; and the court had deemed it prudent to avoid the possibility of such a movement to remove them to the city of Richmond in the latter part of April last, whence, at the instance of the counsel for those prisoners, they were returned to the jail of Louisa county in August last. But the court overruled the prisoner’s motion to quash said writ of venire facias, and called the panel; to which opinion of the court, overruling said motion, the prisoner by his counsel excepts, and prays that this his bill of exception, may be signed, sealed and enrolled, and made a part of the record in this case, which is accordingly done.
“W. S. Barton. [Seal.]”
The court is of opinion that the circuit court did not err in overruling the prisoner’s motion to quash said writ of venire facias.
It was not necessary that the list from which the venire was directed to be summoned, should have contained the names of more than twenty-four persons, although it might have contained more. If the list *contain the names of twenty-four persons, then of course those twenty-four can be summoned under the writ of venire facias mentioned in chapter 17, section 4, page 340, Acts of Assembly, 1877-8. This question is well settled by authority. See Sand’s case, 21 Gratt. 871; Poindexter’s case and Baccigalupo’s case, supra, 766, 807; all of which cases are cited by the attorney-general in this case.
Nor is it error that the said list and the said writ contained the names of the same persons who had been summoned from a list furnished by the judge of the county court of Louisa to attend the court on the first day of its term. &c. Those persons might be competent and suitable jurors, and if so there could be no valid nor reasonable objection to their serving as such. But if not, it was not necessary that they should so serve, and doubtless they would not have so served.
“2d bill of exceptions.
“Be it remembered that oh the trial of this cause, the Commonwealth, to sustain the issue on her part, offered in evidence the confession said to have been made by the prisoner soon after his arrest, to the introduction of which the prisoner by his counsel objected, unless the Commonwealth first showed by clear and indisputable affirmative evidence, that the said confession was free and voluntary and had not been induced by any promises held out to. or threats made against the prisoner, by those engaged in his arrest.
“The Commonwealth, to prove the said confession had been free and voluntary, introduced Capt. John Tyler of Hanover, who testified that on the 27th of March, 1879, in company with John A. Waddy, he arrested the prisoner in the low grounds on the farm of Henry Gardner, where the prisoner lived and was *employed by the year; the arrest was made about 12 o’clock; that on his arrest, the prisoner said he had done nothing; he seemed to want to talk, but I told him I did not want to hear him; I sent John A. Waddy ahead to the place where we had left the horse and jersey, and told him to tell the crowd there assembled not to say anything to the prisoner; I searched him *620 and found on him some small money in coin, a copper speil mark, and a small pistol marked ‘Prairie King’; put him in the jersey and sent him to Yanceyville; several persons went with him in the jersey; something was said to him about Talley, who was jointly indicted with him; there was a considerable crowd assembled at Yancey-ville, and along the road from Gardner’s, who were a good deal excited; I heard some say he ought to be hung.
“On cross-examination, witness said that R. P. Cammack and Ned Kinney went along with the prisoner in the jersey to Yanceyville; I oijered the prisoner no inducements to confess, and made no threats against him to make him confess. I left to arrest Talley, living about y2 a mile off, leaying 10 or 15 men in charge of the prisoner and three others.
“W. S. Hunter, another witness, being introduced said, that when Capt. Tyler went to arrest Talley, he left me, a constable of Louisa county, in charge of the prisoner and three others; J. E. Bibb and R. P. Cammack also had charge of him; Capt. Jack Wren and W. S. Knox, two Richmond detectives, engaged in the arrest, and in working up the case, after Tyler left to arrest Talley, took the prisoner out of the wagon and started with him; Knox soon stopped, and Wren went on with the prisoner some 15 or 20 steps from the crowd, and just out of the road, and talked with him from 3 ti) 5 minutes, then called to us, and I think his expression was, ‘this boy wants to tell about *it;’ the whole transaction did not exceed 10 minutes. When we came up, Wren said to the prisoner, now, before you make any statement, I want you to understand 'I don’t hold out any inducement to you to tell anything; if you tell it must be voluntary, or you can tell or not as you please. I can’t undertake to give the exact words that he used; that was the amount of it.
_ “W. S. Knox, one of the Richmond detectives, was then introduced, and testified that he was sitting on a log with Longden, who said to him the .man is coming, and when the jersey got there Wren and the prisoner walked off some distance to one side, and in a little while Wren beckoned to him and he went to meet Wren and the prisoner, and some others were there; that he said to prisoner, you can’t say anything to me, you must tell it to these gentlemen; that the prisoner asked him, if he would confess would it do him any good; and witness replied that he would make him no promises; that he would have to see Mr. Winston (then acting Commonwealth’s, attorney), and he could make his agreement with him, and offered to go with him to see Mr. Winston. This last conversation was had either as they got back into the wagon, or while they were on their way to the courthouse .afterwards — it could not be distinctly understood which. (The witness was a good deal under the influence of liauor, and his statements were very confused, and to some extent unintelligible.)
“Ned Kinney was then introduced, and testified that he drove the jursey down near Gardner’s, where the prisoner was arrested. Capt. Tyler brought the prisoner, Dawson Price and Nelson Smith, whom he had arrested; told me to hitch up, he would bring the jersey along; I must go on when we got to' Yanceyville; I had the horse in charge. No inducements *were held out to the prisoner in my presence. I saw him all the time Capt. Tyler was gone. The prisoner seemed anxious to talk about the matter.
‘After the foregoing witnesses were examined, in the absence of the jury, upon the admissibility of the "confession, the court decided that it appeared to it that the confession was free and voluntary, and admitted if to go to the jury.
“And the jury being recalled, said James M. Tyler stated to the jury that after bringing the prisoner to near the old store, near the place where the store of Walton, at Yanceyville, had been burned, where a halt was made, he went off on horseback to arrest Wm. Talley, who lived mile off, and was gone about 20 minutes, after which he returned and took all the prisoners in charge and started off with them, but had not gone far when he called the prisoner back and took him to the mill in the presence of Mr. J. E. Smith, and told him he could make any statement he desired. This was after he had made a confession in the presence of Waddy and Hunter, immediately after his interview with Knox and Wren in the woods, spoken of in the testimony of W. S. Hunter, above detailed, and in the testimony of John A. Waddy, hereinafter mentioned, and was late in the evening. Capt. Tyler then detailed the confession then made to him in the presence of J. E. Smith, late on the evening of the arrest, and just as they were starting to bring the prisoner to jail, which is detailed in the certificate of facts certified by the court in this cause contained in the 3d bill of exceptions.
“J. E. Smith being introduced detailed the same confession.
“Another witness, John A. Waddy, was then introduced before the jury on the part of the Commonwealth, who..testified that he was present at the first *confession, which took place near the old storehouse, near Yanceyville. Wren and Knox, the detectives, took the prisoner out in the woods, about 30 steps from the crowd, and talked to him about 10 minutes. Knox left him, and from 2 to 3 minutes after, Wren called out to him and said, the prisoner has. or wants to, or has confessed, and then the prisoner and Wren came up, and the first confession was made in the presence of Hunter, myself, Wren and Knox.
“And 'thereupon the prisoner, by his counsel, moved the court to exclude the confession which had gone to the jury, on the ground that the Commonwealth had not shown by clear proof that the first confession, made in the presence of Waddy, Hunter, Knox and Wren, under the circumstances above detailed, was free and voluntary; that *621 it was encumbent on the Commonwealth to show by affirmative testimony, that the first confession was not obtained by promise, or threats; that, to say the least, it was left in doubt whether the said confession was free and voluntary or not.
“The counsel for the prisoner insisting that the Commonwealth should have introduced Wren as a witness (he having been summoned by the Commonwealth) to show what had passed between himself and the prisoner when he was aside with him, as testified to by Hunter and Waddy, before the court passed upon the admissibility of the confession, commenting with great earnestness upon the failure of the Commonwealth to introduce the detective Wren; but the court declined to entertain the motion at that time, being unwilling to have the time of the court consumed by that and similar motions which might be made when any evidence might be introduced touching the subject; and suggested that as the confession had gone to the jury, the motion to exclude be postponed until all the evidence had been heard, when it could be considered *upon all the evidence together. The examination of witnesses was resumed, and after the conclusion of the testimony and just before the adjournment of the court for the balance of the night, the prisoner, by his counsel, renewed his motion to exclude the confession; the court took time to consider of the motion until the next morning. After resuming the case the next morning, the court overruled the motion to exclude; and the prisoner by his counsel noted his exception thereto; and the attorney for the Commonwealth commenced his argument to the jury, and after speaking a few minutes it was announced by the Commonwealth’s attorney, that Wren had arrived on the morning train, having been telegraphed for; and thereupon the court stopped the argument and examined Captain Jack Wren, who testified that after the prisoner had arrived at the old store near Yanceyville, he went with him aside, at his request, for him to urinate; that the prisoner mumbled out something;hewasabsentfrom thecrowdnot more than half a minute, that he made no promises to, or threats' against the prisoner; that the prisoner then returned to the crowd and made the first confession in the presence of himself, Knox, Hunter and Waddy. Tt appeared that upon the offer of the prisoner, by his counsel, to show that the witness Wren was unworthy of credit, it was admitted by Capt. George D. Wise, who had been employed to assist the Commonwealth’s attorney in the prosecution, that said witness was unworthy of credit and not to be believed. Said Wren then stated on cross-examination that he had been hired to work up the case against the prisoner, and that his pay depended on his conviction. Whereupon the prisoner, by his counsel, excepted to the opinion of the court admittinp-the confession of the prisoner made to Capt. Tyler in the presence of J. E. Smith, set out in the certi6cates of facts *contained in the 3d bill of exceptions, and asked that this his bill of exceptions might be signed, sealed and enrolled and made a part of the record in this case; which is accordingly done.
“W. S. Barton. [Seal.]”
The court is of opinion that the circuit court did not err (as suggested in the second bill of exceptions) in admitting the confession of the prisoner made to Captain Tyler in the presence of J. E. Smith, set out in the certificate of facts contained in the third bill of exceptions. There is nothing in the record to show that the said confession was not free and voluntary, or that it had been induced by any promises held out to. or threats made against, the prisoner, by those engaged in his arrest or any other person, but the contrary. There is not a particle of evidence in the case to show that any such promise was held out to, or threat made against the prisoner. Captain Tyler, by whom the prisoner was arrested and to whom the confession was made as aforesaid, positively testified “that on his arrest the prisoner said he had done nothing; he seemed to want to talk, but I told him I did not want to hear him. I offered the prisoner no inducements to confess, and made no threats against him to make him-confess.”
W. S. Hunter, another witness, testified that when Captain Tyler went to arrest Talley (one of the accused), he left the witness, a constable of Rouisa county, in charge of the prisoner; “Capt. Jack Wren and W. S, Knox, two Richmond detectives, engaged in the arrest and in working up the case, after Tyler left to arrest Talley, took the prisoner out of the wagon and started with him; Knox soon stopped, and Wren went on with the prisoner some 15 or 30 steps from the crowd, and just out of the road, and talked *with him from 3 to 5 minutes, then called to us, and 1 think his expression was ‘this boy wants to tell about it;’ the whole transaction did not exceed 10 minutes, When we came up, Wren said to the prisoner, now, before you make any statement, I want you to understand, I don’t hold out any inducement to you to tell anything; ii you tell, it must be voluntary, or you can tell or not as you please.”
W. S. Knox testified that “Wren and the prisoner walked off some distance to one side, and in a little while Wren beckoned to him. and he went to meet Wren and the prisoner, and some others were there; that he said to prisoner, you can’t say anything to me — you must tell it to these gentlemen; that the prisoner asked him if he would confess would it do him any good, and witness replied he would make him no promises; that he would have to see Mr. Winston, then acting Commonwealth’s attorney, and he could make his agreement with him, and offered to go with him to see Mr. Winston.”
Ned Kinney, another witness, testified, that “no inducements were held out to the prisoner in my presence. I saw him all the time Capt. Tyler was gone. The prisoner seemed anxious to talk about the matter.”
After the foregoing witnesses were examined, in the absence of the jury, upon the *622 admissibility of the confession, the court decided that it appeared to it that the confession was free and voluntary, and admitted it to go to the jury.
And the jury being recalled, testimony of the said confession, made at different tinies, including the first confession, made in the presence of Waddy, Hunter, Knox and Wren, under circumstances set forth in the record, was introduced.
And thereupon the prisoner, by his counsel, ■ moved the court to exclude the confession which had gone to *the jury, on the ground that the Commonwealth ’had not shown by clear proof that the first confession, made in the presence of Waddy, Hunter, Knox and Wren, under the circumstances above detailed, was free and voluntary; that it was encumbent on the Commonwealth to show by affirmative testimony that the first confession was not obtained by promises or threats; that, to say the least, it was left in doubt whether the said confession was free and voluntary or not.
The counsel for the prisoner insisting that the Commonwealth should have introduced Wren as a witness to show what had passed between himself and the prisoner when he was aside with him, as testified to by Hunter and Waddy. before the court passed upon the admissibility of the confession, the said Wren was accordingly introduced as a witness for that purpose, and “testified that after the prisoner had arrived at the old store near Yanceyville, he went with him aside, at his request, for him to urinate; that the prisoner mumbled out something; he was absent from the crowd not more than half a minute; that he made no promises to, or threats against, the prisoner; that the prisoner then returned to the crowd and made the first confession in the presence of himself, Knox. Hunter and Waddy.”
Now it plainly appears from what has been hereinbefore said, that the confession of the prisoner made to Captain Tyler, in the presence of J. E. Smith, set out in the certificate of facts contained in the third bill of exceptions, was admissible evidence in this case, and therefore the circuit court did not err in admitting the said confession as evidence in the. said case as stated in the second bill of exceptions in the case. The following authorities referred to b.y the attorney-general on this branch of -the case seem to sustain his views on the subject, vizi: Wolfe’s case, 30 Gratt. 833; Smith’s *case, 10 Id. 734; Shifflet’s case, 14 Id. 653; Page’s case, 27 Id. 954; Venable’s case, 24 Id. 639; 1 Greenleaf on Ev.. § 339.
“3d bill of exceptions.
“Be it remembered that after the jury in the case had returned a verdict against the prisoner of ‘guilty of murder in the 1st degree, the prisoner by his counsel, moved the court to set the same aside on the ground that’it was contrary to the law and the evidence; which motion the court overruled; to which ruling of the court the prisoner, by his counsel, excepted, and asked the court to certify the facts proved, which is accordingly done, and thereupon the court certified the following as the facts proved;
“That the store-house of C. K. Walton, in which he also slept at Yanceyville, in the county of Eouisa, was burned on the night of Saturday, the 8th of March, 1879; that the fire was first seen by James E. Smith, between 1 and 2 o’clock of the morning of that night; that the said house was two stories high, built entirely of wood; that it was old and very dry and burnt up quickly; that when first seen the whole western side on which the bed in which Walton slept was situated, was covered with fire, which quickly reached the shingles; that persons did not go very near it at first, for fear of theexplosion of a keg of powder which was known to be in it; that in a short time the powder did explode, scattering the weather-boarding some distance; that said store-house was about 40 feet square, with four rooms below; the one next the road was the store-room, in which dry goods, groceries and liquors were kept; adjoining this to the west was the one in which Walton slept, and in which he kept some goods, notions, &c.; another room was used as a dining-room; another as a kitchen; that there was a cellar below the *room in which Walton slept, 18 by 19; there were two doors on the front, two on the west side, and one on the north side of the house, and doors leading from one room to another on the inside; said store was situated on the main road leading from Louisa courthouse to the 3-chopped road, which was much traveled; that Mr. Nuckolls lived about 250 y’ds, J. E. Smith about 350 y’ds, and Jack Hunter, a colored man, about 250 y’ds, from said storehouse.
“It was further proved that Mr. Smith, who lived near the store, was awakened that morning by some sort of noise, saw the light of the fire and went near it; the whole house was in flames. That morning about 8 o’clock, part of the body of a white person was discovered in the cellar immediately under the place where the bed in which Walton slept, sat; said body was at the foot of where the bed sat, in an inclined position, lying on the breast, the back up; the legs, arms and head .were gone; small pieces of bones were found amongst the ashes; the bowels were burnt to a crisp; the back was not blistered, but was discolored; that a piece of dark cloth was taken from the back, about two inches square, and another piece, which was taken by the witness to be part of the bed-clothing or something of the- sort, a good deal of something like bed-clothing was raked off of the back; no signs of blood or marks of violence were seen about the body or the cloth found; that the sex to which the body belonged could not be told. It was further proved, that Walton was a man of very peculiar structure, broad shoulders, tapering down to a small waist, the part of the body found answered this description; that Walton was a bachelor living by] himself, and no one usually slept with him at the store. It was further proved, that Walton was at his store on Saturday night about *623 after 7 o’clock; that Zeno. Jones and *his brother E. A. Bowis, George
Anderson, a colored man, William Talley. also a colored man, and Wm. Bolling, were at the store that evennig; that when Wm. Bolling left about 7)4 o’clock, he left William Talley there, and that Eliza Jackson, who came there three times a day to cook for Walton, had left. It was further proved, that Walton read some times at night, that his goods were insured for $1,000; that he had more than enough owing to him in good hands to pay all his debts, although he owed some money, and that he was not embarrassed. It was further proved that the prisoner, on the evening of his arrest, about 5 o’clock, and just at the time Capt. Tyler was starting with him to the courthouse, he was called back by Capt. Tyler, and told that he could make any statement he desired, and the prisoner, then in the presence of Capt. Tyler and Mr. Smith, and perhaps others, made the following statement or confession, no inducements being then held out to him by anyone. He stated that on Friday night, before the store was burnt, Bill Talley came to his house and said he wanted him to go some where with him the next night; that the next night he went over to Bill Talley’s house, and Bill Talley, Eliza Jackson and himself went to Walton’s store; that he was told by Bill Talley to stand in the road and watch; that Eliza Jackson and Bill Talley went over to the store; that Eliza Jackson knocked at the door; that the door was opened by Walton, and Bill Talley and Eliza Jackson went in and the door was closed; that he heard something like a scuffle, and in a few minutes they came out at a different door; Bill Talley bro’t out the cash drawer and gave him some money, amongst which was a torn five dollar note; that Talley said they had killed Walton and told him to keep quiet or they would kill him; Talley then threw the cash drawer away; they then separated, *Bill Talley and Eliza Jackson going one way and he another; that he heard something like a groan in the store; that the money he had, came out of the money drawer, and also the spiel mark, and that the pistol he had came out of the store; that they were going down the road, and that Talley did not tell him what he wanted him to come to his house on Saturday night for, and said he did not see the fire or hear the report of the explosion of the keg of powder.
“It was proved, that when the prisoner was arrested, while at work in the field of Mr. Gardner, his employer, he said he had done nothing; and after being arrested, there was found on his person, a spiel-mark coin, a small silver-plated pistol, revolver, and some small sum in silver coin. It was further proved, that the prisoner said to Mr. Gardner, with whom he lived, on Wednesday after the fire, he had lost ten dollars, in two five-dollar notes, one of which had been torn in two by him, and he had tried to mend it by pasting some paper over it; said he had gotten $5 from his sister, and $4.75 from George Anderson; when told that those two sums did not make $10, he said he had some other money before, and that was all the money he had except 75 cts.
“It was proved by the sister of prisoner, called by him as a witness, that she had lent to the prisoner, about Christmas last. $3, and he had paid her only 75 cts. of it.
“It was further proved, that the prisoner had lived with and worked for Mr. Gardner for three years; that he gave him $65 a year for his services, paying him at Christmas and along as he wanted it; that in February last, he had paid him $15 in Richmond, prisoner saying that he was going to get married, and wanted to get something to go to house-keeping with; that he brought home a bedstead and safe; and that he had *paid him $3.60 in specie after the fire — six half dollars, two quarters and one ten-cent piece.
“It was further proved, that the prisoner was industrious and steady at his work; that he was provident, and did not squander his money, as negroes usually do.
“It was further proved, that the prisoner was at home, at Mr. Gardner’s, three miles from Yanceyville, on the night of the fire; that he was seen there about 8 o’clock that nighfi and again about day-break the next morning.
“It was further proved, that the deceased had taken in on Saturday, the day of the fire, a $5 note which had been torn in two, and which had been attempted to be mended by pasting a piece of paper on the back.
“It was further proved, that the pistol found in possession of the prisoner on the day of his arrest, 18 days after the fire, was like a pistol which was in the possession of Walton on the Friday evening previous to the fire, which was purchased in Richmond in the fall of 1878, and was the only one of that kind purchased; that the pistol in possession of Walton was a small silver-plated revolver (7 shooter); that the catch which held the cylinder in place was out of order, and that it was hard on trigger; the one found in possession of the prisoner had the same peculiaritv. and was marked on the barrel ‘Prairie King.’
“It was further proved, that a pair of boots at the time of his arrest, was found in possession of the prisoner’s brother, who, being called upon by the prisoner, said he bought them of the prisoner after the fire, new, and had only worn them once.
“It was further proved, that deceased bought his shoes and boots for his store, of Gardner, Carlton & Baldwin, wholesale boot and shoe merchants, of the city of Richmond, and that the boots sold by this firm had on them the initials of their firm, G., C. B.
*“It was further proved that deceased had only two pairs left of his last purchases, a pair of No. 6’s and a pair of No. 8’s; that the boots found in possession of the prisoner’s brother were No. 8’s, and had on them the letters G.. C. & B. It was admitted that Gardner, Carlton & Baldwin sold boots and shoes all over the State, to every merchant they could.
*624 “It was further proved that a peculiar copper coin, commonly known as a spiel mark, was found in possession of the prisoner on his arrest in his pocket, .which was identified as like one which the deceased had taken in during the fall of 1878, which he kept as a pocket piece for some time, and it was then left in his cash drawer, and was there on the Saturday previous to the fire. None of the witnesses who spoke of it had evqr seen one like it. It was further proved that the prisoner spent at Louisa courthouse, amongst the merchants there, a few days before his arrest, $3.95 in small change, and had in his possession the same day $5 or $6 in specie, and that he had spent his money, and exhibited it without any secrecy or concealment. It was further proved that there was in Walton’s cash drawer, on the day before the fire, $60 or $70 in notes, and $20 or $25 in specie, including 400 to 500 coppers. Only 46 cents were found in the ashes of the burnt store. It was further proved that on Tuesday after the fire, a cash drawer like the one Walton had, was found in 10 or 12 yards from an old shop, which was 41 yards from the store on the main road, near the place where the prisoner in his confession said he was standing watching; that a 3-cent piece was found at the same time near the place where the prisoner in his confession said he parted with Bill Talley and Eliza Jackson the night of the fire. It was further proved that on Friday night before the fire, William Talley was at Adeline Jackson’s, half mile from the store, *mile from his house and three miles from Gardner’s, where the prisoner lived; that he got there about dark, and staid there until what the witness supposed late bedtime, and supposed to be 10 or 11 o’clock.
“It was further proved that Bill Talley and George Anderson were at the house of Fanny Jackson on the night of the fire; that they got there in the early part of the night. Bill Talley staid there a short time and George Anderson did not stop, but went on. It was further proved that the prisoner was a young colored man, about 21 or 22 years old, and not very intelligent.
“The jury having found the prisoner guilty of murder in the first degree, and these being all the facts proved in the case, the prisoner, by his counsel, moved the court to set the verdict aside, on the ground that it was contrary to the law and the evidence; which motion the court overruled, and to the opinion of the court overruling said motion, the prisoner, by his counsel, excepts, and prays that this, his bill of exceptions, with the certificate of facts, may be signed, sealed and enrolled, and made a part of the record in this case, which is accordingly done.
“W. S. Barton. [Seal.]”
The court is of opinion that the circuit court did not err in overruling the motion of the prisoner to set aside the verdict on the ground that it was contrary to the law and the evidence, as stated in the third and last bill of exceptions; the court being of opinion that it was not contrary either to the law or the evidence. There can be no controversy about the law which applies to the case, and the facts proved on the trial being certified by the circuit court, there can be no controversy about the evidence, in deciding the question we are now considering. The facts certified *being hereinbefore set out, and the law which' applies to the case being plain and well settled, it cannot be necessary to say much if anything upon that question. According to those facts and that law the deceased was murdered, and the prisoner was present, aiding and abetting in the commission of the murder with which he was charged, and of which he hg.s been convicted in this case. The conclusion is irresistible, that the circuit court did not err in overruling the motion to set aside the verdict as aforesaid.
That the prisoner was present aiding and abetting in the commission of the murder is conclusively shown by the confession proved on the trial of the prisoner to have been made by him, and to have been free and voluntary. He states in that confession, “that on Friday night, before the store was burnt, Bill Talley came to his home and said he wanted him to go some where with him the next night; that the next night he went over to Bill Talley’s house, and Bill Talley, Eliza Jackson and himself went to Walton’s store; that he was told by Bill Talley to stand in the road and watch; that Eliza Jackson and Bill Talley went over to the store; that Eliza Jackson knocked at the door; that the door was opened by Walton, and Bill Talley and Eliza Jackson went in and the door was closed; that he heard something like a scuffle, and in a few minutes they came out at a different door; Bill Taljey brought out the cash drawer, and gave him some money, amongst which was a torn five dollar note; that Talley said they had killed Walton, and told him to keep quiet or they would kill him; Talley then threw the cash drawer away, they then separated, Bill Talley and Eliza Jackson going one way and he another; that he heard something like a groan in the store; that the money he had, came out of the money drawer, and also the spiel mark, and that the pistol he *had came out of the store; that they were going down the road, and that Talley did not tell him what he wanted him to come to his house on Saturday night for, and said he did not see the fire or hear the report of the explosion of the keg of powder.”
That according to the. facts just stated, the prisoner was a principal in the second degree in the commission of the said murder, and just as liable to conviction of the said murder, on an indictment charging the murder generally, as he would have been if he had been a principal in the first degree, in the commission of the said offence, is conclusively shown by all the authorities on the subject. For example, .see 1 Russell on Crimes 26-30; 3 Greenleaf on Evidence, (Redfield’s edition), Part V, §§ 40 and 41; and Davis’ Criminal Law 35, 36.
In 3 Greenleaf, supra, it is, among other *625 things, said in section forty that “persons participating in a crime are either principles or accessories, if the crime is k felony, they are' alike felons. Principals are such either in the first or second degree. Principals in the first degree are those who are the immediate perpetrators of the act. Principals in the second degree are those who did not, with their own hands, commit the act, but were present, aiding and abetting it. It is not necessary, however, that this presence be strict, actual and immediate, so as to make the person an eye or ear witness of what passes; it may be a constructive presence. Thus if several persons set out in concert, whether together or apart, upon a common design which is unlawful, each taking the pari assigned to him, some to commit the act, and others to watch at proper distances to prevent a surprise, or to favor the escape of the immediate actors; here, if the act be committed, all are in the eye of the law present and principals; the immediate perpetrators in the first ^degree, and the others in the second.” And in section forty-one, that “the presence alone of the party is not sufficient to constitute him a principal in the second degree, unless he was aiding and abetting the perpetrator. “ This implies assent to the crime; and mere bodily presence, without any attempt to prevent the crime, though it will not of itself constitute guilty participation, is evidence from which a jury may infer his consent and concurrence.”
To the same effect is the law laid down in 1 Russell on Crimes, and Davis’ Criminal Law, cited supra. But it is unnecessary to repeat here what is said there, as those books are easily accessible to us all.
It cannot be necessary to say anything more to show that the court below did not err in any of the rulings mentioned in either of the three bills or exceptions taken in this case, all of which have been fully considered by us.
But some objections are taken by the counsel for the plaintiff in error, to some of the proceedings in the court below in the case, anterior to the taking of any of the said bills of exceptions, which objections, or some of them, ought perhaps to be noticed' in this opinion.
The demurrer to the whole indictment and each count thereof was overruled by the circuit court. This is not assigned as error in the petition for a writ of error in this case, and it may therefore be regarded as no error in the judgment of the circuit court, as it certainly is not.
It is stated in the record that the prisoner moved the court to allow him a mixed jury, which the court overruled. To this action of the court, no exception was taken therein, and the objection thereto is now made, for the first time, in this court The court is of opinion, that the circuit court did not err in overruling *the said motion, even if it be not now too late to raise the question, for the first time in this court.
The remaining assignments of error, made by the counsel for the prisoner in his petition and written argument before this court, seem to be founded, alone, on the three bills of exceptions made a part of the record in the case, which have already been fully considered in the foregoing opinion and need not be further noticed.
At the conclusion of the said written argument, signed by the attorney for the plaintiff in error, is the following statement: “For the information of the court, I will state that William Talley an4 Ann Eliza Jackson, jointly indicted with the prisoner, have been tried and acquitted.” The case of the prisoner before this court, cannot be affected by the result which has taken place in regard to the case of the said Talley and Jackson. They, probably, made no confession, and the confession of the prisoner was not legal evidence against them. While there was, doubtless, insufficient evidence to convict them, there was sufficient to convict the prisoner, who was therefore convicted; and his conviction can only be affected (if such affection be proper) by the action of the executive in the exercise of its power of pardon, absolutely 'or conditionally.
Upon the whole, the court is of opinion that there is no error in the said judgment of the circuit court, and that the same ought to be affirmed.
The judgment was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that there is no error in the judgment of the circuit court; and therefore it is considered that the same be affirmed. At the con-elusion *of the written argument signed by the attorney for the plaintiff in error in this case, it is stated -“that William Talleyand Ann Eliza Jackson, jointly indicted with the prisoner, have been tried and acquitted.” The case of the prisoner before this court, cannot be affected by the result which has taken place in regard to the case of the said Talley and Jackson. They, probably, made no confession, and the confession of the prisoner was not legal evidence against them. While there was, doubtless, insufficient evidence to convict them, there was sufficient to convict the prisoner, who was therefore convicted; and his conviction can only be affected (if such affection be proper) by the action of the executive in the exercise of its power of pardon, absolutely or conditionally; which is ordered to be certified to the circuit court of Eouisa county.
Judgment affirmed.